El Juez Asociado Señor Rivera García
emitió la opinión del Tribunal.
Este recurso de certiorari nos exige resolver tres contro-versias de carácter medular. En primer lugar, debemos de-terminar si una acción de nulidad de adopción por supues-tos vicios del consentimiento de la madre biológica, por motivo de haberlo prestado mediante coacción e intimida- *216 ción, puede instarse pasado el término de caducidad de dos años que proveía el Art. 613E del antiguo Código de Enjui-ciamiento Civil, infra, según tal disposición existía en nuestro ordenamiento legal al momento de la adopción en controversia. En segundo plano, tenemos que considerar si es permisible que se determine una filiación natural posterior a la consumación de una filiación adoptiva, y si ambas filiaciones están sujetas al principio de incompatibilidad de filiaciones contradictorias. De resolver que este principio no aplica, nos corresponde precisar cuáles son los efectos jurídicos implicados por el reconocimiento posterior de la referida filiación natural y su existencia concurrente con la filiación adoptiva ya materializada.
En tercer lugar, examinaremos si la acción sobre nuli-dad de procedimientos de adopción y declaración de filia-ción presentada por los recurridos resulta improcedente en derecho, según la doctrina de la cosa juzgada, o por razón de su derivada, la figura del impedimento colateral por sentencia.
Teniendo presente las controversias legales que nos ata-ñen, pasemos a dilucidar los antecedentes fácticos aplica-bles a su resolución.
I
El Sr. Samuel Beníquez Méndez (señor Beníquez Mén-dez) nació el 28 de octubre de 1971.(1) Al anotarse su naci-miento en el Registro Demográfico, no se divulgó el nombre de su padre biológico.(2) No obstante, su certificado de na-cimiento reseñaba que su madre biológica era la Sra. Antonia Beníquez Seguí (señora Beníquez Seguí).(3)
Luego del nacimiento del señor Beníquez Méndez, el 5 de junio de 1972, el Sr. Félix Beníquez Quiñones (señor *217 Beníquez Quiñones) y la Sra. Ada E. Méndez Costas (seño-ra Méndez Costas) (colectivamente, el matrimonio Bení-quez Méndez) presentaron ante el otrora Tribunal Superior una petición para su adopción.(4) En su escrito, el matrimonio adujo haber tenido bajo su custodia y cuidado al señor Beníquez Méndez desde el día en que nació.(5) Además, indicaron ser los tíos de la madre del menor —la señora Beníquez Seguí— y que ésta, junto a su hijo, habi-taba con ellos por no tener los recursos para su sosteni-miento o el de su prole.(6)
En apoyo a su solicitud, el matrimonio Beníquez Mén-dez presentó una declaración jurada de la madre del menor en la cual ésta expresaba su consentimiento a la adopción. (7) Luego de celebrar una vista el 2 de febrero de 1973,(8) el 21 de febrero del mismo año el tribunal senten-ciador declaró “ha lugar” la petición. (9)
Casi treinta años después, el 13 de mayo de 2003, el señor Beníquez Méndez y la señora Beníquez Seguí (los recurridos) presentaron ante el Tribunal de Primera Ins-tancia una moción para la nulidad de la adopción.(10) Esen-cialmente, argumentaron que la señora Beníquez Seguí fue coaccionada e intimidada por el matrimonio Beníquez Méndez para que prestara su consentimiento a la adopción de su hijo.(11) Como resultado, alegaron que su consenti-miento estaba viciado, y maculaba de nulidad la resolución emitida el 21 de febrero de 1973. Ello, pues, un consenti- *218 miento viciado priva al tribunal de jurisdicción, haciendo que la resolución emitida fuese inexistente.(12)
Asimismo, los recurridos argüyeron que el señor Bení-quez Méndez fue criado por su madre desde la fecha de su nacimiento y que, incluso, a sus seis años se mudó con ésta a vivir en una residencia distinta a la de sus tíos.(13) Más aún, añadieron que el matrimonio Beníquez Méndez solo procuraba la adopción del menor para lucrarse económica-mente de un hijo que supuestamente nunca criaron.(14)
Mediante una resolución no fundamentada, el 13 de septiembre de 2003, el Tribunal de Primera Instancia de-claró “no ha lugar” la moción de los recurridos.(15) Esta de-cisión nunca fue apelada o revisada, adviniendo final y firme.
Posteriormente, el 4 de noviembre de 2004, la señora Beníquez Seguí y el señor Beníquez Méndez presentaron una segunda reclamación sobre nulidad de procedimientos de adopción y declaración de filiación.(16) En ésta, los recu-rridos alegaron que la señora Beníquez Seguí, cuando aún se encontraba embarazada del señor Beníquez Méndez, fue coaccionada, amenazada y sujeta a “presiones mentales, morales, emocionales y religiosas” para que consintiese a que sus tíos —el matrimonio Beníquez Méndez— adopta-sen a su hijo.(17)
Además, y distinto a lo alegado en su primer petitorio, los recurridos argüyeron que el referido patrón de coacción e intimidación se debió a que el Sr. Teófilo Vargas Seín (señor Vargas Seín), líder espiritual de la congregación re-ligiosa Mita, era el padre biológico del señor Beníquez *219 Mendez,(18) y que los tíos de la señora Beníquez Seguí —-junto a otras personas de la congregación— orquestaron la adopción indicada con el fin de ocultar tal realidad.(19) Cónsono con lo anterior, solicitaron que se decretase la nu-lidad de la adopción bajo examen y que se ordenase al Re-gistro Demográfico a inscribir al señor Beníquez Méndez como hijo biológico de la señora Beníquez Seguí y del señor Vargas Seín.(20)
Luego de varios trámites procesales, el 23 de diciembre de 2005, el Tribunal de Primera Instancia emitió su dicta-men desestimando sumariamente los reclamos del señor Beníquez Méndez y su madre biológica.(21) El foro primario razonó que las alegaciones y los fundamentos esbozados por los recurridos en esta segunda demanda eran idénticos a aquellos articulados en la primera solicitud de nulidad de adopción, la cual fue declarada “no ha lugar” el 13 de agosto de 2003.(22)
Consecuentemente, resolvió que esta primera sentencia constituía cosa juzgada con relación a la causa de acción presentada por segunda vez contra el matrimonio Bení-quez Méndez.(23) En cuanto a la nueva alegación de que el señor Vargas Seín era el padre biológico del señor Bení-quez Méndez, el tribunal sentenciador concluyó que tal ar-gumento debió de haberse invocado oportunamente en la primera demanda de nulidad de adopción. Debido a que los recurridos no procedieron de esa manera, determinó que la doctrina de impedimento colateral por sentencia imposibi-litaba considerar su causa de acción contra el señor Vargas Seín.(24)
*220 Además, el foro primario resolvió que la impugnación de adopción presentada por los recurridos era tardía, ya que el término de caducidad provisto para ello en el Código de Enjuiciamiento Civil había expirado.(25) A su vez, acogió la demanda de los peticionarios como una moción de relevo de la resolución de adopción emitida el 21 de febrero de 1973 y concluyó que fue presentada tardíamente, según el tér-mino de seis meses provisto por la otrora Regla 49.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Finalmente, el tribunal le impuso a los recurridos el pago de honorarios de abogado por temeridad.(26)
Inconformes con el dictamen del foro primario, el 2 de febrero de 2006, los recurridos acudieron en alzada al Tribunal de Apelaciones. Contando con la oposición de los pe-ticionarios, el 6 de noviembre de 2007, el Tribunal de Ape-laciones dictó su sentencia para revocar al Tribunal de Primera Instancia y ordenar la continuación de los proce-dimientos, por entender que no aplica la doctrina de cosa juzgada y que la acción de nulidad de adopción no había caducado.(27)
Oportunamente, el 6 de diciembre de 2007, los peticio-narios acudieron ante nos impugnando la decisión del Tribunal a quo. En su recurso de certiorari, le imputan al foro apelativo intermedio haber cometido los errores siguientes:
PRIMER ERROR
Erró el Honorable Tribunal de Apelaciones al determinar que la causa de acción presentada por la parte recurrida no ha caducado.
SEGUNDO ERROR
Erró el Honorable Tribunal de Apelaciones al determinar que la controversia presentada en la Demanda no es cosa juzgada y/o que no existe impedimento colateral.
TERCER ERROR
Erró el Honorable Tribunal de Apelaciones al no determinar *221 que transcurrió en exceso el término para interponer una mo-ción de relevo de sentencia al amparo de la Regla 49.2 de las de Procedimiento Civil.(28)
Atendido el recurso de certiorari presentado por los pe-ticionarios, el 4 de abril de 2008 expedimos el auto solicitado. Contando con la comparecencia de ambas par-tes, procedemos a esbozar el marco jurídico aplicable a las controversias planteadas inicialmente.
II
A. Las doctrinas de cosa juzgada e impedimento colateral por sentencia
1. Cosa juzgada
 En nuestra jurisdicción, la doctrina de cosa juz-gada encuentra su origen en el Art. 1204 de nuestro Código Civil.(29) En su parte pertinente, el citado estatuto dispone lo siguiente:
Para que la presunción de cosa juzgada surta efecto en otro juicio, es necesario que entre el caso resuelto por la sentencia y aquél en que ésta sea invocada, concurra la más perfecta identidad entre las cosas, las causas, las personas de los liti-gantes y la calidad con que lo fueron. (Enfasis nuestro.)(30)
Cuando un litigante articula exitosamente los elementos necesarios para que aplique la doctrina de cosa juzgada,
... [e]l efecto inexorable es que la sentencia decretada en un pleito anterior(31) impide que, en un pleito posterior, se liti-guen entre las mismas partes y sobre la misma causa de ac- *222 ción y cosas, las cuestiones ya litigadas y adjudicadas, y aque-llas que pudieron haber sido litigadas y adjudicadas con propiedad en la acción previa.(32)
De tal manera, la doctrina bajo examen “persigue poner fin a los litigios luego de haber sido adjudicados de forma definitiva por los tribunales y, de este modo, [garantiza] la certidumbre y seguridad de los derechos declarados me-diante una resolución judicial para evitar gastos adiciona-les al Estado y a los litigantes”.(33) Es así que nuestro or-denamiento legal “protege el interés del Estado en ponerle fin a los litigios y el de los ciudadanos de no ser sometidos en múltiples ocasiones a los rigores de un proceso judicial”.(34)
Como bien se desprende del articulado citado, la pre-sunción de cosa juzgada solo cobra efecto si existe la más perfecta identidad de cosas, causas, las personas de los li-tigantes y la calidad con que lo fueron.(35) A continuación analizamos sucintamente cada elemento.
El requisito que requiere que exista una perfecta iden-tidad entre las cosas litigadas, exige
... identificar cuál es “el bien jurídico cuya protección o con-cesión se solicita del juzgador”. M. Serra Domínguez, Comentarios al Código Civil y Compilaciones Forales, 2da ed., Ed. Rev. Der. Privado, 1991, T. XVI, Vol. 2, pág. 735. Dicho análisis requiere considerar no sólo la cosa sobre la cual se suscita la controversia, sino que debe evaluarse cuál es el planteamiento jurídico que se genera en torno a ella en el procedimiento en concreto. íd., pág. 736. Lo esencial es, pues, determinar que ambos litigios se refieran a un mismo asunto. Rodríguez v. Colberg Comas, [131 D.P.R. 212, 220 (1992),] citando a Q.M. *223 Scaevola, Código Civil, Madrid, Ed. Reus, 1958, pág. 534.(36)
En cuanto a la necesidad de que exista identidad de causas entre ambos pleitos, hemos dispuesto lo siguiente:
Recuérdese que causa “es el motivo de pedir”. Scaevola, Có-digo Civil, 2da ed., 1958, T. 20, pág. 535. ... “[Significa el fundamento capital, el origen de las acciones o excepciones planteadas y resueltas”. Manresa, Comentarios al Código Civil Español, 5ta ed., 1950, T. 8, Vol. 2, págs. 237-238. Así, el Tribunal Supremo de España ha dictaminado que “la diversi-dad de acciones no impide la estimación de la cosa juzgada cuando la razón y causa de pedir es la misma en una y otra, y por tanto, no es el nombre ni la naturaleza, declarativa o cons-titutiva, la que pueda impedir identidad de la causa preten-dida, sino que en este respecto la decisión es si los hechos y fundamentos de las peticiones son los mismos en lo que afecta a la cuestión planteada”. (Sentencia de 19 de febrero de 1962, Manresa, op. cit.) Otro decreto establece que “la causa equi-vale a un fundamento o razón de pedir, siendo la acción mera modalidad procesal que es necesario ejercitar para que aquélla tenga efectividad en juicio; que si son idénticas las cosas y causas, no obsta a la eficacia de la cosa juzgada que a la acción se le dé distinto nombre, sin que desaparezca la identidad bá-sica de la presunción porque en el segundo juicio se haga un pedimento distinto no decidido en el primero ...”. (Sentencia de 30 de octubre de 1965.) (Énfasis en el original.)(37)
Por último, referente a la exigencia de que exista iden-tidad de los litigantes y la calidad con que lo fueron, basta *224 con decir que “las personas jurídicas que son parte en am-bos procedimientos, cumplidos los requisitos de identidad entre las causas y las cosas, resultarían directamente afec-tados por la [presunción] de la cosa juzgada”.(38)
“Si concurren las identidades ... requeridas por el Artículo 1204 del Código Civil, supra, no procede la dilucidación en los méritos de la controversia que está ante la consideración del foro judicial.”(39) Sin embargo, aun estando presentes los componentes necesarios para que la doctrina de cosa juzgada surta efecto, hemos sido diáfanos en establecer que la referida figura legal “ ‘no es absoluta y debe siempre considerarse conjuntamente con el saludable principio de que debe dispensarse justicia en cada caso”.(40) Es por ello que hemos resuelto que debemos abstenernos de aplicar la doctrina aludida “cuando al hacerlo se derrotan o se ‘desvirtúan los fines de la justicia, produce resultados absurdos o cuando se plantean consideraciones de interés público’ (Enfasis nuestro.)(41)
A pesar de lo expresado, “ ‘no se favorece el reconoci-miento y la aplicación liberal de excepciones a la doctrina de cosa juzgada ante el riesgo de que se afecte el carácter de finalidad de las controversias adjudicadas ...’. De esta forma, evitamos se propicie la ‘relitigación masiva de las controversias judiciales resueltas’ (Citas omitidas.)(42)
*225 2. Impedimento colateral por sentencia
El impedimento colateral por sentencia constituye una modalidad de la doctrina de cosa juzgada.(43) Así, ésta persigue alcanzar los mismos propósitos procurados por la doctrina de res judicata. A saber: “proteger a los litigantes contra lo que representa defenderse o probar sus reclamaciones en repetidas ocasiones tratándose de la misma controversia, [y] promover la economía judicial y administrativa al evitar litigios innecesarios y decisiones incompatibles”.(44)
Ahora bien, la figura bajo examen “se distingue de la cosa juzgada en que para aplicarla no es necesario que se dé el requisito de identidad de causas”.(45) Esta “ ‘surte efectos cuando un hecho esencial para el pronunciamiento de una sentencia se dilucida y se determina mediante sentencia válida y final, [y] tal determinación es concluyente en un segundo pleito entre las mismas partes, aunque estén involucradas causas de acción distintas’ ”.(46)
Claro está, “la sentencia anterior es concluyente solamente en cuanto a aquellas materias que de hecho se suscitaron y verdaderamente o por necesidad se litigaron y adjudicaron, pero no es concluyente en cuanto a aquellas materias que pudieron ser pero que no fueron litigadas y *226 adjudicadas en la acción anterior”.(47) Por tal motivo, “no procede la interposición de la doctrina de impedimento co-lateral por sentencia ... cuando la parte contra la cual se interpone no ha tenido la oportunidad de litigar previa-mente el asunto ni ha resultado ser la parte perdidosa en un pleito anterior”. (Enfasis suprimido.)(48)
Establecido lo anterior, urge examinar algunos princi-pios esenciales de la figura jurídica de la filiación. Veamos.
B. La filiación
1. Conceptos generales
Como bien articulamos en Castro v. Negrón, “[l]a filiación es el estado civil de la persona, determinado por la situación que, dentro de una familia, le asigna el haber sido engendrada en ella o el estar en ella en virtud de la adopción o de otro hecho legalmente suficiente al efecto”. (49)
De la definición transcrita se desprende que la institución civil de la filiación se manifiesta a través de dos realidades fundamentales: la biológica y la jurídica.(50) Como bien detallan Diez-Picazo y Gullón, “[i]nicialmente, la filiación es un hecho biológico y consiste en que una persona ha sido engendrada o procreada por otra”. (Enfasis nuestro.)(51) Posteriormente, nuestro ordenamiento jurídico recoge este hecho biológico y lo regula mediante la distribución de derechos y obligaciones entre los progenitores y los seres procreados por ellos.(52) Concretamente, es *227 esta regulación del hecho biológico la que caracteriza a la filiación jurídica.
Pese a lo anterior, resulta imperativo tener presente que, en ocasiones, la relación biológica de la filiación no siempre coincide con la relación juridica.(53) Como bien he-mos recalcado en pronunciamientos anteriores, “ ‘[l]a filia-ción no es ... necesariamente una situación derivada de un hecho biológico. De algún modo puede decirse que una cosa es ser padre y otra cosa ser progenitor. ... Padre y progenitor no son sinónimos. Padre contiene una carga de sen-tido socio-cultural y jurídico de la que carece el término progenitor’ ”.(54)
Más bien, hemos aseverado que la relación filiatoria puede catalogarse como una relación fundamentalmente jurídica “que requiere de una serie de criterios para establecerse. De estos criterios, los biológicos son los básicos, aunque éstos no siempre entran en acción”.(55)
Abundando en lo anterior, el distinguido profesor Raúl Serrano Geyls comentó lo siguiente:
Por un lado, la relación jurídica de parentesco presupone la previa identificación de la relación biológica, pero a veces eso no es de fácil comprobación, ya sea porque no se conoce quién *228 es la madre o el padre, o porque hay más de una persona a quien se le podría identificar como tal. En otras ocasiones, aunque se sepa quiénes son los padres, la ley puede no darle eficacia jurídica al hecho del parentesco biológico, y así niega los derechos y obligaciones que de ordinario emanarían del mismo.(56)
El referido desfase nace de la riqueza y complejidad que entraña la filiación jurídica ante el mero dato biológico,
... en cuanto categoría jurídica y social que es y en la que se integran elementos afectivos, volitivos, sociales, formales, etc.; destacan en ella, además, unos roles importantes que la socie-dad y el Derecho confieren a los protagonistas de dicha rela-ción, donde lo funcional y el papel social tienen a veces mayor trascendencia que el elemento natural o biológico.(57)
Apoyándonos en los principios generales hasta aquí es-bozados, pasemos a discutir las clases de filiación existen-tes en nuestro ordenamiento legal y los mecanismos jurí-dicos disponibles para su fijación.
2. Las clases de filiación y los medios para su determi-nación
i. La filiación natural
Esencialmente, todo tipo de filiación puede tener lugar por la naturaleza o por la adopción.(58) La primera modalidad, la natural, implica la existencia de un vínculo *229 biológico(59) Este modo de filiación se bifurca, a su vez, en otras dos modalidades: la matrimonial y la extra-matrimonial. (60)
“La filiación matrimonial es, como su propio nombre indica, aquélla surgida por la generación o concepción dentro del matrimonio.’(61) (Énfasis nuestro.) Esta vertiente nace de una presunción controvertible, instaurada por el Art. 113 del Código Civil de Puerto Rico(62) el cual dispone que “[s]e presumen hijos del marido de la mujer casada los nacidos durante el matrimonio y los nacidos antes de los trescientos días siguientes a su disolución”(63)
Lo anterior es cónsono con la norma civilista pater vero is est quern nuptiae demostrant, la cual establece que el padre de toda criatura es el hombre casado con la madre del hijo o la hija nacida(64) El uso de esta presunción en la determinación filial matrimonial encuentra su razón de ser en la dificultad práctica de determinar quién es el padre de un ser humano(65) Contrario a la maternidad, la que siem-pre puede determinarse con tan sólo probar que la mujer *230 ha alumbrado y que el hijo o la hija nacida procede de ese alumbramiento (mater semper certa est), resulta imposible concretizar a modo cierto la paternidad de una criatura (pater semper incertus).(66)
Ante esa incertidumbre, la presunción discutida repre-senta el medio más idóneo para concretizar jurídicamente ese aspecto. Solo así nuestro ordenamiento jurídico logra fomentar la defensa de la paz familiar; reducir, en la me-dida de lo posible, el número de eventuales litigios(67) y, desde el nacimiento, asignarle padres ciertos a los hijos.(68)
Cuando no existe tal vínculo matrimonial, entonces será procedente invocar las normas de la filiación extramatrimonial. La referida modalidad no goza de la presunción de paternidad instaurada por nuestro Código Civil a favor de la filiación matrimonial.(69) Más bien, su determinación dependerá del reconocimiento voluntario efectuado por el padre biológico(70) o del decreto judicial resultante de una acción de reconocimiento forzoso instada por alguien legitimado para ello.(71)
Con relación al primero de estos medios, el reconocimiento voluntario, basta con decir que “[cjonsiste de una admisión del hecho de la paternidad (o maternidad) que hace el progenitor, la cual permite establecer el estado *231 civil del hijo”. (Énfasis suprimido.)(72) Hemos indicado en el pasado que “el reconocimiento [es] el medio más impor-tante para determinar la filiación no matrimonial”,(73) el cual se caracteriza por ser un acto individual, personalí-simo, unilateral, formal, puro e irrevocable.(74)
Una vez efectuado el reconocimiento, “[q]ueda así pues determinada la filiación por la afirmación del progenitor mediante un acto jurídico, ‘cuyo contenido implícito o ex-plícito es la declaración de que ha existido el hecho bioló-gico de la procreación del que ha nacido el hijo sobre el que recae el reconocimiento’ (Citas omitidas. )(75)
Relativo al segundo medio mencionado, el decreto judicial de filiación, amerita indicar que éste “presupone un reconocimiento forzoso mediante: primero, una reclamación judicial de filiación; segundo, prueba del hecho filiatorio; y, tercero, sentencia al respecto declarando la filiación”.(76)
El decreto judicial de filiación puede instarse mediante una acción civil ordinaria al amparo del Art. 125 del Código Civil de Puerto Rico.(77) En lo pertinente, esta *232 acción de reconocimiento forzoso podrá ejercitarse durante la vida del presunto padre, o un año después de su muerte, salvo: (1) que el padre o la madre hubiesen fallecido du-rante la minoría de edad del hijo, en cuyo caso se podría deducir la acción antes de que transcurran los primeros cuatro años de su mayoría de edad, y (2) que luego de la muerte del padre o de la madre apareciere algún docu-mento del que antes no se hubiese tenido noticia, en el que reconozcan expresamente al hijo, en cuyo caso deberá de-ducirse la acción en los seis meses siguientes al referido hallazgo.(78) Como bien hemos expresado en numerables ocasiones, es importante tener presente que los referidos términos son de caducidad.(79)
Ahora bien, aunque nuestro ordenamiento legal regula de modo distinto la determinación oficial de cada tipo de filiación, al igual que las diferentes acciones de reclamación e impugnación para cada una de ellas,(80) es im- *233 perativo resaltar que el que un hijo sea matrimonial o ex-tramatrimonial no implica un trato distinto con relación a sus derechos y obligaciones en función de sus padres y familia.(81) Como bien indicamos en Almodóvar v. Méndez Román, “nuestro ordenamiento [les] atribuye los mismos derechos, facultades, obligaciones, deberes, incompatibili-dades y prohibiciones dentro de la organización de la fami-lia y la sociedad”.(82) En fin, no importa la manera en que un individuo adquirió su estado o condición de hijo, ya sea “desde el momento mismo del nacimiento o desde el mo-mento del reconocimiento [,] no hay duda de que una vez adquirida tal condición se trata de ‘un mismo y único grupo: hijos’ ”.(83)
Habiendo examinado los aspectos medulares de la filia-ción natural, corresponde dilucidar algunos conceptos ge-nerales ligados a la figura de la filiación adoptiva.
ii. La filiación adoptiva: su fijación e impugnación
La segunda vertiente de la institución de la filiación, la adoptiva, se define como “un acto jurídico solemne, el cual supone la ruptura total del vínculo jurídico-familiar de una persona con su parentela biológica y la consecuente filiación de ésta con aquel o aquellos que han expresado la voluntad de que legalmente sea su hijo”.(84) Esta modalidad de la filiación prescinde del fundamento biológico, permitiendo así que, por ficción de ley, el acto jurídico sustituya el hecho natural,(85) con iguales deberes y obligaciones jurídicas y sociales que aquellas existentes en la filiación *234 natural(86) Claro está, a pesar de la equiparación rese-ñada, la filiación adoptiva continúa siendo, “en principio, ... una creación del Derecho [que imita] a la naturaleza y [suple] deficiencias personales de ésta”(87)
a. El procedimiento de adopción previo a la reforma legislativa de 1995
Al momento de la adopción del señor Beníquez Méndez, los aspectos procesales y sustantivos de la institución de la filiación adoptiva se regían por el Código de Enjuicia-miento Civil (hoy Ley de Procedimientos Legales Especia-les), 32 L.P.R.A. ant. sec. 2691 et seq., y el Código Civil de Puerto Rico, 31 L.P.R.A. sec. 531 et seq., respectivamente. Ambos estatutos subsistían a la luz de la reforma legisla-tiva en materia de adopción que instauraron las Leyes Núms. 85 y 86 de 15 de junio de 1953, previo a la adopción de las Leyes Núm. 8-1995 (31 L.P.R.A. sec. 531-634c y 8 L.P.R.A. secs. 403-404a, 430 y 432) y Núm. 9-1995 (32 L.P.R.A. secs. 2699-2699t), y la Ley Núm. 186-2009 (8 L.P.R.A. sec. 1051 et seq., 31 L.P.R.A. secs. 531-634c, 32 L.P.R.A. secs. 2699-2699).
Los aspectos sustantivos que se debían cumplir para ob-tener un decreto de adopción estaban regulados por los Arts. 130 al 135 del Código Civil de Puerto Rico(88) Esos artículos disponían sobre los requisitos del adoptante, quiénes no podían serlo, quiénes no podían ser adoptados, la adopción conjunta o individual en caso de matrimonios, así como las personas llamadas a consentir a la adopción(89) Una vez superados esos requisitos de carácter *235 sustantivo, entonces la ley regulaba detallada y específica-mente el procedimiento para obtener la autorización judicial para una adopción.(90) En M.J.C.A., Menor v. J.L.E.M., Menor, señalamos que “[l]os requisitos sustantivos para ser adoptante son jurisdiccionales. Su incumplimiento priva de jurisdicción al tribunal”. (Énfasis en el original.)(91) Es decir, si se incumplía con los requisitos sus-tantivos que exigían los Arts. 130 al 135 del Código Civil, supra, no se superaba el filtro para que el tribunal tuviera la potestad de otorgar la autorización judicial a la adopción.
Procesalmente, la filiación adoptiva se consumaba por virtud de un decreto judicial originado al presentar una solicitud jurada de adopción.(92) Esta solicitud debía conte-ner todas las alegaciones que sirviesen de base para la de-terminación de la conveniencia de la adopción y debía ser notificada al fiscal de distrito correspondiente.(93)
Posterior a la presentación de la solicitud, y solo en ca-sos en los que el adoptado fuese un menor de edad, el tribunal estaba obligado a ordenar a la entonces dependencia de Bienestar Público a celebrar un estudio social referente a la solicitud de adopción incoada, cuyo contenido aten-diera determinados factores dispuestos por ley y recomen- *236 dase o no la adopción solicitada.(94) Una vez la dependencia de Bienestar Público culminara el estudio indicado, debía entregar al tribunal un escrito referente a este.(95) Recibido el informe, el otrora Tribunal Superior celebraba vistas en cámara con la intervención del fiscal, los adoptantes, los adoptados, los padres biológicos —cuando su presencia era necesaria — , los testigos y algún consejero o representante de la dependencia del Bienestar Público.(96)
Si el Tribunal autorizaba la adopción solicitada, el se-cretario del Tribunal remitía una copia certificada de la resolución dictada en el caso a la División del Bienestar Público y a la División del Registro Demográfico y Estadís-ticas Vitales del Departamento de Salud.(97) Una vez el de-creto de adopción advenía final y firme, “[cesaban] todos los derechos, deberes y obligaciones del adoptado en su fa-milia natural o biológica y los de ésta con el adoptado”.(98) Consecuentemente, el ordenamiento legal consideraba al adoptado como hijo del adoptante, con todas las derivacio-nes legales que tal aseveración implicaba.(99)
b. La impugnación de un decreto de adopción
Ahora bien, al momento de la adopción del señor Beníquez Méndez, nuestro derecho de adopción proveía a *237 una parte legitimada para ello la posibilidad de incoar una acción de nulidad contra un decreto de adopción.(100) Así, el Art. 613E del Código de Enjuiciamiento Civil, promulgado por la Ley de 1953, proveía lo siguiente: “Transcurrido el periodo de dos (2) años desde la fecha de la resolución del tribunal autorizando la adopción, cualquier irregularidad en los procedimientos se considerará subsanada y la vali-dez de la adopción no podrá ser atacada directa ni colate-ralmente en ningún procedimiento.”(101)
Según interpretó el profesor Serrano Geyls, el citado es-tatuto no representaba una acción de revocación de la adopción. (102) Más bien, éste disponía de una acción ambi-gua de nulidad, la cual estaba limitada únicamente a aque-llas irregularidades en el procedimiento que fuesen cons-tatadas por los tribunales.(103) Esta clarificación implicaba que los adoptantes y adoptados no gozaban de la facultad de poder dejar sin efecto, unilateral o bilateralmente, la adopción consumada por haber experimentado un cambio de criterio con referencia a su deseabilidad de haber con-sentido a la adopción.(104)
En el 2000, en Martínez Soria v. Proc. Esp. Rel. Fam., 151 D.P.R. 41 (2000) (Sentencia), este Tribunal se enfrentó por primera vez a una de las controversias que hoy nos ocupan, a saber: si era posible impugnar exitosamente un decreto de adopción a pesar de haber transcurrido el pe-riodo de dos años que proveía la Ley de 1953 para la acción de nulidad explicada.
Aunque ninguna ponencia en este caso alcanzó los votos necesarios para convertirse en opinión del Tribunal, hemos *238 analizado los fundamentos variados de la opinión disidente así como las distintas opiniones concurrentes que se emi-tieron con el propósito de lograr una interpretación cón-sona con la verdadera intención que tuvo el legislador al incluir el Art. 613E en el Código de Enjuiciamiento Civil en 1953. (105)
Los hechos particulares de aquel caso quedaban confi-gurados por una joven adoptada a sus diecisiete años de edad por el esposo de su madre natural.(106) Cuando al-canzó la mayoría de edad —dos años y tres meses después de decretarse su adopción— la joven impugnó su adopción mediante una moción al efecto ante el Tribunal de Primera Instancia.(107) Como fundamento para su petición, alegó que fue víctima de abuso sexual desde que tenía trece años de edad por parte de quien posteriormente se convirtió en su padre adoptivo.(108)
En oposición a su petitorio, la Procuradora Especial de Relaciones de Familia alegó que la impugnación del de-creto de adopción era improcedente por haber transcurrido un periodo en exceso de los dos años provistos por el dero-gado Art. 613E del Código de Enjuiciamiento Civil para esa clase de acción.(109) Luego de varios trámites procesales, el Tribunal de Primera Instancia concedió la solicitud de la peticionaria y dejó sin efecto su decreto de adopción.(110) Fundamentó su decisión en que el término de caducidad de dos años que estableció el Art. 613E del Código de Enjui-ciamiento Civil comenzaba a transcurrir a partir de la fe- *239 cha cuando un menor adoptado advenía a la mayoría de edad.(111)
Inconforme con el dictamen del foro primario, la Procu-radora acudió en alzada ante el otrora Tribunal de Circuito de Apelaciones, para reafirmar los argumentos que esbozó originalmente ante el Tribunal de Primera Instancia.(112) El foro apelativo intermedio falló a su favor.(113) Una vez la controversia arribó ante esta Curia, resolvimos vía senten-cia, y por distintos fundamentos, que el Tribunal de Apela-ciones erró y que procedía devolver el caso al Tribunal de Primera Instancia para dilucidar en una vista evidenciaría las alegaciones vertidas por la joven que impugnaba su adopción.(114)
La opinión concurrente de la entonces Jueza Asociada Señora Naveira de Rodón se concentró en realizar una dis-tinción entre los requisitos procesales y sustantivos de la adopción para propósitos de analizar cuándo un decreto de adopción es nulo o anulable. Amparándose en lo expuesto en el caso M.J.C.A., menor v. J.L.E.M., menor, supra, en el que señalamos que el incumplimiento con los requisitos sustantivos de la adopción privaban de jurisdicción al Tribunal, la Jueza Asociada concluyó que cuando la adopción se impugna por haberse dictado en violación de los requi-sitos jurisdiccionales del procedimiento de adopción, pro-cede declarar la nulidad del decreto de adopción, ya que éste se aprobó sin que el Tribunal tuviera jurisdicción y representa un acto jurídico inexistente.(115) Debido a que la nulidad acarrea la inexistencia del decreto de adopción, *240 ésta “no se deja llevar por término ... de caducidad alguno puesto que falta jurisdicción”.(116)
Además, la Jueza Asociada entendía que las normas ge-nerales sobre la nulidad y anulabilidad de los negocios ju-rídicos aplicaban al ámbito de la adopción, teniendo pre-sente “las debidas adaptaciones a la especial naturaleza del acto de adopción”. (Citas omitidas.)(117) La Jueza enten-día que el requisito sustantivo del consentimiento de las personas incluidas en el Art. 135 del Código Civil, supra, estaba sujeto a la doctrina de los vicios del consentimiento por motivo del error, el dolo, la intimidación y la violencia. (118) Por ello, cuando se pudiera probar que, en efecto, hubo consentimiento a la adopción, pero estuvo vi-ciado, entonces el procedimiento de adopción era anulable.(119)
El Juez Asociado Señor Negrón García expuso, de en-trada, que los hijos adoptivos están protegidos por el Art. II, Sec. 1, de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, que prohíbe el discrimen por nacimiento.(120) El Juez Asociado circunscribió la controversia del caso en “el dere-cho que tiene todo hijo a esclarecer su origen, a saber, los factores, las circunstancias y los motivos que dieron lugar a su filiación”. (121) Así, pues, utilizó ese fundamento para sostener que “[n]uestra Constitución no permite negarle a un hijo adoptivo el derecho que tiene un hijo biológico de dilucidar ante un tribunal de justicia las causas y el origen de su filiación”.(122) Al equiparar la filiación biológica y adoptiva, sostuvo que no podía imponérsele a un hijo adop- *241 tado un término menor al que tiene un hijo biológico al amparo del Art. 126 del Código Civil,(123) para impugnar su presunción de filiación. (124)
Entendió que, en el caso ante él, la señorita Martínez Soria atacaba “precisamente el origen de su filiación por adopción”. (125) En otras palabras, “deseaba esclarecer la si-tuación que enmarcó su adopción y desenmascarar un ale-gado procedimiento fraudulento”.(126) El Juez Asociado re-conoció que la acción de la presunción de la paternidad y el recurso ante sí eran distintos, pero se apoyaban en un mismo fundamento: ennoblecer la verdad. (127)
En síntesis, concluyó que la acción de la señorita Mar-tínez Soria “se apuntala [ba] en una dirección distinta a las incluidas en el aludido Art. 613E del Código de Enjuicia-miento Civil”.(128) Esto pues, si se probaban las alegaciones en torno a la agresión sexual por parte del padre adop-tante, entonces “su petición de adopción sólo fue un subter-fugio para continuar perpetuando un abuso que en nada contribuiría al bienestar de la peticionaria”, por lo que “su petición sería una perjura y fraudulenta, y nula ab initio”.(129) Finalmente, sugirió utilizar los remedios de la Regla 49.2 de Procedimiento Civil(130) para dilucidar el po-sible fraude que se configuró en la petición de adopción de la señorita Martínez Soria. (131)
Por su parte, el Juez Asociado Señor Fuster Berlingeri *242 entendió que el Art. 613E de la Ley de Procedimientos Le-gales Especiales, supra, le permitía a la señorita Martínez Soria presentar la acción de nulidad. Tras realizar un re-cuento de los propósitos de la adopción, razonó que “la ins-titución de la adopción existe para salvaguardar principal-mente el interés del adoptado”.(132) (Enfasis en el original.) De ahí que no se pueda utilizar la figura de la adopción para corromper y deformar esa institución.(133) Argüyó, además, que la adopción se considera perpetua, pero que tal irrevocabilidad “significa que la subsistencia del estado civil creado por la adopción no puede quedar a merced de un cambio de voluntad o resolución unilateral del adop-tante, y tampoco de una anuencia entre las partes”.(134) Ahora bien, analizó que lo anterior no significaba que la adopción tuviera “que subsistir ad perpetuara”.(135) Explicó que desde los tiempos de las Siete Partidas del rey Adolfo X “El Sabio”, “se reconoció que el vínculo entre adoptado y adoptante era susceptible de quebrantamiento”.(136) Añadió que actualmente en España existe también la acción de impugnación de la adopción.
Al mismo tiempo, enfatizó en que “nuestra ley sobre adopción ha reconocido el carácter permanente y la natu-raleza invulnerable que debe permear la institución, esta-bleciéndose así un limitado término para el ejercicio de la acción de impugnación” en el Art. 613E de la Ley de Pro-cedimientos Legales Especiales.(137) Asimismo, planteó que “[e]l establecimiento de este limitado período de dos (2) años refleja el propósito legislativo de preservar la seguri-dad jurídica y la estabilidad familiar, a los fines de fijar *243 permanentemente una relación inmutable revestida de ciertas consecuencias jurídicas, ... anulando, así la posibi-lidad de que el nuevo estado civil del hijo adoptivo quedara al libre arbitrio de los adoptantes, de él mismo, e incluso de ambos”(138)
De igual forma, el Juez Asociado Fuster Berlingeri creía que el mencionado Art. 613E tenía una laguna respecto “al sujeto que la impugna”(139) Basándose en el derecho de otras jurisdicciones que admiten la interrupción de los tér-minos de caducidad en caso de menores e incapacitados hasta que estos advengan a la mayoría de edad, el Juez concluyó que “la certeza e inmutabilidad del nuevo estado civil” debía “ceder ante el apremiante interés del Estado de proteger el derecho de los incapaces”(140) Por todo ello, afirmó que el término de caducidad de dos años dispuesto en el Art. 613E debía computarse desde el momento cuando la hija adoptiva adviniera a la mayoría de edad(141) Sin embargo, puntualizó que “[l]a anulación de la adopción ... sólo procedería en casos de causas extremas como la de este caso, en los cuales no hay posibilidad real alguna de vida familiar entre el adoptante y la adoptada”(142)
Por último, en su opinión disidente, el Juez Asociado Señor Corrada del Río se apartó de la postura de los Jueces concurrentes y concluyó:
El hecho de que el Art. 613E de la Ley de Procedimientos Legales Especiales, supra, establece el término de caducidad de dos (2) años para la impugnación de una adopción y que lo hace sin especial atención al sujeto que la impugna, significa que dicho término aplica erg a omnes, sin que se reconozca por el Legislador excepción de clase alguna. No se trata de una *244 laguna en el estatuto; se trata de un claro mandato estatuta-rio a los efectos de que transcurridos dos (2) años de la adop-ción “[l]a validez de la adopción no podrá ser atacada directa ni colateralmente en ningún procedimiento”. (Enfasis en el original.)(143)
Su postura se fundamentó principalmente en que “[a]brir las adopciones a una multiplicidad de acciones de impugnación, ... representa un grave riesgo a la certeza y permanencia de las relaciones paterno-filiales .. ,”.(144) Ade-más, entendió que al permitirle a un hijo adoptivo que im-pugne su adopción por haber sido abusado sexualmente por su padre o madre adoptante se estaría “creando una causa de acción de impugnación a la paternidad adoptiva que una hija biológica no tiene contra su padre bajo las mismas circunstancias”.(145)
Finalmente, sostuvo que la hija adoptiva no quedaba desprovista de remedio, pues tenía la potestad de deshere-dar a su padre por haber atentado contra su pudor, solici-tar un cambio de nombre para no tener que utilizar el ape-llido del padre adoptante, iniciar una acción penal en su contra y, si es menor de edad, solicitar su emancipación si tiene más de dieciocho años o reportarlo a las autoridades correspondientes. (146)
Consideramos que los hechos particulares que se dieron en el caso Martínez Soria v. Proc. Esp. Rel. Fam., supra, llevaron a los jueces a buscar una excepción para casos tan delicados y funestos como el que tuvieron ante su consideración. Pero no podemos derrotar la intención del legislador por lo impresionante de unos hechos. Como se-ñalamos en Rivera Coll v. Tribunal Superior, 103 D.P.R. 325, 331 (1975), “el principio de que los estatutos sobre *245 adopción deben ser interpretados liberalmente, a favor del adoptado ... no puede conducirnos ni a violentar la inten-ción legislativa, ni a consagrar absurdos”. Recordemos que la Ley Núm. 85 de 15 de junio de 1953 añadió el Art. 613E amparándose sustancialmente en la Ley Uniforme de Adopción de 1953.(147) Sabido es que “[cjuando un estatuto es copiado o adoptado de una ley extranjera o de otra ju-risdicción, se presume que se adopta con la interpretación que se le ha dado hasta ese momento en la jurisdicción de donde procede”.(148)
Unos tratadistas en la materia han expuesto que aun-que el Uniform Adoption Act no fue apadrinado por mu-chos estados, representa la corriente en el derecho de adop-ción con relación a la anulación de las adopciones. La sección original del Uniform Adoption Law de 1953 refleja el intento de sus creadores de dar por terminados los de-cretos de adopción en favor del desarrollo y la certidumbre del estatus familiar.(149) Y aunque en Rivera Coll v. Tribunal Superior, supra, señalamos que “[a] partir del 15 de junio de 1953, con la aprobación de las leyes Núm. 85 y Núm. 86 de ese año, ... tanto el procedimiento para la adopción como la figura jurídica de la adopción son el pro-ducto de nuestra autoctonía ... [y por lo tanto] recurrir a interpretaciones de estatutos foráneos, por persuasivos *246 que parezcan, resulta en futilidad”, lo cierto es que la co-rrecta solución de la controversia debe “depender de nues-tra propia interpretación de la intención legislativa al aprobarse las citadas leyes”.(150)
Hemos realizado un análisis exhaustivo y detenido del historial legislativo de la Ley Núm. 85 de 15 de junio de 1953, supra. Sin embargo, no encontramos discusión sobre el Art. 613E, supra.
De un análisis del texto del citado Art. 613E observamos que el legislador puertorriqueño, contrario a limitar las causas de anulación, creó un estatuto no condicionado a limitación alguna para impugnar la adopción antes de que venciera el periodo de dos años desde que ésta fue decretada. Después de esa fecha, entonces, “cualquier irregularidad en los procedimientos se considerará subsanada y la validez de la adopción no podrá ser atacada”.(151) En estos mismos términos se expresó el reconocido profesor y tratadista puertorriqueño Efraín González Tejera al expresar que “[e]l referido artículo regula el problema relativo a la eficacia de la resolución que dicte el Tribunal en casos de adopción, limitando el plazo dentro del cual debe actuar el promovente que interese se declare su nulidad”. (152) Explicó el profesor que
[e]n primer lugar, [el art. 613E] lidia con causales de nulidad cuyo origen se encuentre en algún vicio del procedimiento. Culminar la adopción sin citar ni oír a los padres biológicos, o mediante citación por edictos cuando debió citarse personal-mente al padre natural, no oír al adoptado menor de edad cuando debió oírsele, falta de estudio e informe del Departa-mento de Servicios Sociales (cuando se trata de la adopción de un menor o incapacitado), serían vicios del procedimiento para *247 los cuales el citado artículo concede una acción, que debe ejer-citarse dentro de los dos años de la adopción.(153)
Añade el profesor que a pesar de que el Art. 613E “no utiliza un lenguaje claro ... fija un periodo igual para ata-car la adopción cuando se trate de vicios del consenti-miento”. (Énfasis suplido.)(154) Explicó que “[n]uestro orde-namiento legal no hace referencia a la revocación del con-sentimiento prestado para la futura adopción”.(155) Por ello, para él resulta de ayuda la teoría general de las obligacio-nes, en cuanto a los vicios del consentimiento, así como la legislación y las expresiones judiciales de otras jurisdic-ciones.(156) A modo de ejemplo, trajo los casos en los que los estatutos de algunos estados condicionaban la anulación de la adopción a defectos mentales del adoptado o a dife-rencias étnicas suscitadas con posterioridad entre el adop-tado y sus padres adoptantes.(157) Sin embargo, es la opi-nión del autor que “toda paternidad tiene sus riesgos!;] no importan los cambios que con el tiempo se produzcan en el adoptado, la adopción debe ser irrevocable”.(158)
En síntesis, aunque sin duda el Art. 613E contaba con múltiples deficiencias en su redacción, lo cierto es que para propósitos de nuestra controversia, tenemos que concluir que un cuestionamiento sobre la validez de una *248 adopción por vicios del consentimiento está conceptuali-zado en el amplio lenguaje del Art. 613E de del Código de Enjuiciamiento Civil.(159)
Teniendo presente el marco legal relacionado a la insti-tución de la filiación natural y adoptiva, resta examinar la interrelación de ambas figuras en una sola causa de acción.
C. La relación entre la acción de impugnación de adopción y la reclamación judicial de filiación
Finalmente, debemos examinar cuáles son los efectos de una causa de acción que solicita la determinación de una filiación natural, posterior a la consumación y el perfeccio-namiento de una filiación adoptiva. Específicamente, debe-mos preguntarnos si un hijo o una hija puede solicitar que un tribunal concretice cuál es su filiación natural, años después de haberse fijado su filiación adoptiva. De contes-tar la interrogante planteada en la afirmativa, procede en-tonces analizar cuáles son los efectos jurídicos que la sub-siguiente determinación de una filiación natural conlleva en relación con la filiación adoptiva existente. Veamos.
*249 En nuestro ordenamiento legal rige la norma de la incompatibilidad de filiaciones contradictorias. Según la doctrina legal, resulta “imposible tener dos filiaciones [naturales] o dos padres [o madres biológicos] al mismo tiempo”.(160) Como resultado, “no es posible determinar una nueva filiación [natural] en tanto exista ... otra [filiación natural] contradictoria”.(161)
En vista de lo anterior, hasta que no se impugne exito-samente la filiación natural contradictoria, no procede el reconocimiento de la verdadera filiación.(162) Ello, pues, “[q]uien alega la nueva filiación está obligado a impugnar la filiación existente a través de una acción de impugna-ción, o a ejercitar simultáneamente la de reclamación e impugnación ... pues sólo cuando la filiación oficial se des-truye puede procederse a la determinación de la nueva”.(163)
Sin embargo, este no es el caso cuando se interrelaciona una filiación adoptiva con una natural. Como bien lo señala la autora española Estrella Toral Lara:
El principio de incompatibilidad de filiaciones contradicto-rias no se aplica a la filiación adoptiva, porque ésta y la natural no son contradictorias. Que exista una filiación natural determinada no impide que posteriormente se determina una filiación adoptiva y viceversa, que exista una filiación adop-tiva no impide la posterior determinación de la filiación natural del adoptado sin destruir la primera. La razón es obvia, la filiación adoptiva no tiene su fundamento en la relación bioló-gica de generación, sino en el acto jurídico de la adopción, y no impide que exista una filiación natural previamente determinada. Además debe tenerse en cuenta que, como regla general, la adopción supone la ruptura de los vínculos con la familia anterior, de manera que nunca pueden resultar *250 contradictorias.(164)
La reforma legislativa en materia de adopción, decretada mediante el Art. 1 de la Ley Núm. 8-1995, supra, introdujo en nuestro ordenamiento jurídico una aceptación tácita del principio de la compatibilidad de la filiación adoptiva y la natural. Así, el Art. 137 de nuestro Código Civil provee que “[l]a determinación de filiación del adoptado que ocurra en fecha posterior al decreto de adopción, no afectará la adopción ya vigente, ni al adoptado y su familia adoptante”.(165)
Los tratadistas españoles, interpretando el Art. 180.4 del Código Civil español —equivalente a nuestro Art. 137— han afirmado que, aunque la adopción produce la extinción de los vínculos jurídicos existentes entre el adop-tado y su familia biológica, “[e]sta ruptura, empero, es compatible con la sucesiva determinabilidad de la paterni-dad o maternidad biológica —antes desconocidos— del adoptado; determinación que, sin embargo, no otorgará vínculos jurídicos [con su familia de sangre] ”(166) ni extin-guirá la adopción previamente constituida. (167) Aunque la posterior determinación de la filiación natural sólo persi-gue impedir que el adoptado contraiga matrimonio con un pariente de su anterior familia biológica, estará justificada.(168)
En síntesis, la subsiguiente determinación de la paternidad o maternidad biológica de un individuo no altera el carácter irrevocable de la adopción. Aunque un hijo, durante la vida de su presunto padre biológico, o un año luego de su muerte, pueda instar una acción de reconoci- *251 miento forzoso de filiación biológica contra este, el éxito que pueda devengar de tal encomienda jurídica no elimi-nará los vínculos jurídicos que el adoptado tiene con su nueva familia adoptiva, ni revivirá los lazos que tenía antes con referencia a su familia de sangre. Para todos los efectos prácticos, esa nueva determinación de filiación bio-lógica se limitará a exigir la subsistencia de los vínculos jurídicos del adoptado con su familia natural, a los únicos fines detallados en el Art. 138 del Código Civil de Puerto Rico,(169) a saber: el impedimento matrimonial.
Habiendo considerado el marco jurídico aplicable a las controversias inicialmente esbozadas, pasemos a su disposición.
III
Como bien reiteramos en Rivera Pérez v. León, “ ‘en ma-teria de filiación el Derecho puertorriqueño ha ido abriendo camino a través de la enmarañada jungla de pre-juicios, convencionalismos sociales y tecnicismos de ley para hacer que brille la verdad y se reconozca a todos los *252 fines legales la relación biológica entre padres e hijos’ ”(170) Ante la inacción de la Asamblea Legislativa en la materia legal señalada, y fundamentando nuestros dictámenes ju-risprudenciales sobre la premisa citada, hemos sido conse-cuentes en flexibilizar la normativa puertorriqueña rela-tiva al ámbito de la filiación a la luz de los recientes adelantos científicos y de las corrientes constitucionales modernas(171)
Este proceder jurisprudencial ha encontrado su justificación en la importancia trascendental que reviste el estado filiatorio de un ser humano, de cuya certeza emanan aspectos importantes de naturaleza moral, patrimonial e, incluso, un interés público superior que atañe también al Estado(172) “En definitiva, la filiación es la nota de *253 mayor jerarquía dentro del parentesco y portadora de las más importantes consecuencias jurídicas’ (Citas omitidas.)(173) Teniendo presente el carácter trascendental de la institución de la filiación —adoptiva o natural— con-sideremos cada uno de los errores imputados al Tribunal de Apelaciones por parte de los peticionarios a la luz de los párrafos que anteceden.
A. La causa de acción de los recurridos no está sujeta a la doctrina de la cosa juzgada o del impedimento colateral por sentencia
Los peticionarios en el caso de autos le imputan al Tribunal de Apelaciones haber errado por no haber resuelto que la segunda demanda de los peticionarios era cosa juz-gada o estaba sujeta a la doctrina del impedimento colate-ral por sentencia. No le asiste la razón.
Como bien expusimos, la doctrina de cosa juzgada surte efecto únicamente cuando entre el primer caso resuelto por sentencia y el segundo, en el cual se invoca la doctrina bajo examen, existe la más perfecta identidad entre las cosas, las causas, las personas de los litigantes y la calidad con que lo fueron.
Al analizar la segunda demanda de los recurridos, ésta *254 propulsa dos causas de acción fundamentales, a saber: (1) una acción de nulidad del decreto de adopción de 1973 fun-damentada en el supuesto vicio del consentimiento pres-tado por la madre biológica del señor Beníquez Méndez, y (2) una acción de reconocimiento forzoso de filiación extra-matrimonial instada por el señor Beníquez Méndez contra el señor Vargas Seín.
Cuando examinamos la primera causa de acción de los recurridos, encontramos que entre ésta y la segunda de-manda presentada por el señor Beníquez Méndez y su ma-dre biológica, coincide la más perfecta identidad de las cau-sas, las personas de los litigantes y la calidad con que lo fueron, referente al petitorio instado por los recurridos para solicitar la nulidad del decreto de adopción de 1973. Concretamente, encontramos que: (1) el asunto argumen-tado en ambos litigios concierne la nulidad de un decreto de adopción decretado hace treinta años —identidad de co-sas — , (2) el motivo o la razón de pedir que fundamenta ambas peticiones lo es el alegado vicio en el consentimiento prestado por la madre biológica del señor Beníquez Mén-dez, por razón de haber sido supuestamente sometida a un patrón de coacción e intimidación por sus tíos —identidad de las causas— y (3) los demandados y los demandantes en ambas acciones lo son el matrimonio Beníquez Méndez, y el señor Beníquez Méndez y su madre biológica, respecti-vamente, cumpliéndose así la concurrencia de la identidad de los litigantes y la calidad en que lo fueron.
En virtud de lo anterior, y en circunstancias normales, tal conclusión implicaría que la primera sentencia decre-tada por el Tribunal de Primera Instancia el 13 de septiem-bre de 2003 impediría que los recurridos hubiesen podido presentar o litigar una segunda causa de acción de nulidad del decreto de adopción por los mismos fundamentos y contra las mismas partes que fueron incluidas en la primera demanda, especialmente cuando los recurridos no acudie-ron en alzada de la primera decisión del foro primario. No *255 obstante, aun cuando están presentes todos los componen-tes necesarios para que la doctrina de cosa juzgada surta efectos, desde hace medio siglo este Tribunal adoptó la norma de no aplicar esa figura a casos en los que se frus-tren los fines de la justicia o cuando se plantean conside-raciones de alto interés público.(174)
Precisamente en Pérez v. Bauzá, supra, nos apartamos de la “rigidez que impone la cosa juzgada” y tomamos en consideración que la sentencia que se oponía como cosa juzgada “no adjudicó los méritos de la causa de acción ejer-citada”, y que se consideró “una adjudicación final única-mente por disposición estatutaria fundada en la conve-niencia pública de la finalidad de las sentencias”.(175) Además, se trataba “de una acción de filiación revestida de interés público”.(176) Recordemos que, en este caso, la pri-mera Resolución del Tribunal de Primera Instancia de 13 de septiembre de 2003 declaró “no ha lugar”, la moción sin fundamento alguno. Por eso, este caso no es cosa juzgada.
Además, la preocupación del Juez Presidente Señor Hernández Denton de que con este dictamen se “amenaza la estabilidad de la filiación jurídica entre adoptados y padres adoptivos” se disipa ante la existencia, precisamente, del término de caducidad que la ley dispuso para la impug-nación de una adopción. En otras palabras, quien desee impugnar la adopción tendrá el término de caducidad que dispone la ley. Nada más. Así, pues, esta conclusión “no le resta finalidad a los decretos de adopción” ni atenta contra “la política pública a favor de la estabilidad de las relacio-nes jurídicas mediante decreto de adopción”. Dicho de otro modo, la excepción a la doctrina de cosa juzgada que hoy reafirmamos en nada trastoca ni lacera el término de ca- *256 ducidad que establece el Art. 613E del Código de Enjuicia-miento Civil, supra.
Como bien indicamos al inicio de esta parte dispositiva, la institución de la filiación, incluyendo su vertiente adop-tiva, constituye un interés superior que incide trascenden-talmente en la personalidad y dignidad del ser humano y carga consigo importantísimas consecuencias legales y morales. A su vez, nuestra jurisprudencia ha reconocido que la filiación es un interés público superior que atañe también al Estado. Por tal motivo, y en aras de propiciar justicia en el caso concreto ante nos, no aplicaremos la doc-trina de la cosa juzgada a la segunda demanda de impug-nación de adopción instada por los recurridos.
Referente a la segunda causa de acción del señor Bení-quez Méndez y su madre biológica, la acción de reconoci-miento forzoso argumentada contra el señor Vargas Seín, el Tribunal de Primera Instancia determinó que estaba im-pedida por causa de la doctrina del impedimento colateral por sentencia. El Tribunal de Apelaciones revocó al foro primario. No incidió en error.
Según nuestra exposición del Derecho, la figura del im-pedimento colateral por sentencia representa una modali-dad de la doctrina de la cosa juzgada, la cual se distingue de ésta última en que para aplicarla no es necesario que se dé el requisito de la identidad de causas entre ambos litigios. Claro está, no procede cuando (1) la parte contra la cual se interpone no ha tenido la oportunidad de litigar previamente el asunto —o cuando pudiendo haber litigado el asunto en la primera acción, el asunto no fue litigado o adjudicado en el pleito anterior— y (2) cuando ese litigante no ha resultado ser la parte perdidosa en el pleito anterior.
En el caso de marras, la segunda demanda incluyó, por primera vez, una reclamación de filiación extramatrimo-nial presentada contra el señor Vargas Seín, en la cual el señor Beníquez Méndez argüía que aquél era su padre biológico. Esta segunda causa de acción impide que exista *257 una identidad de causas entre ambos litigios y activa la posibilidad de que aplique la doctrina del impedimento co-lateral por sentencia. Sin embargo, no procede la interpo-sición de esa figura ya que, aunque los recurridos pudieron haber interpuesto el asunto en el pleito anterior, el dicta-men caído en la primera sentencia del foro primario no adjudicó el asunto y los litigantes, en efecto, no litigaron la acción de reconocimiento de filiación ni resultaron ser la parte perdidosa con referencia a ella.
Por tal motivo, resolvemos que, en el caso de autos, no aplican la doctrina de cosa juzgada ni su modalidad, el impedimento colateral por sentencia.
B. La caducidad de la acción de nulidad de la adopción y el vicio en el consentimiento de la madre biológica por motivo de coacción o intimidación
En el primer error que los peticionarios le imputan al Tribunal de Apelaciones, éstos alegan que el foro apelativo intermedio erró al determinar que la causa de acción pre-sentada por la parte recurrida no había caducado. Le asiste la razón.
Al momento de la adopción del señor Beníquez Méndez, el derogado Art. 613E del antiguo Código de Enjuiciamiento Civil, supra, proveía que, transcurrido un término de dos años desde el decreto de adopción, cualquier irregularidad en los procedimientos quedaba subsanada y la adopción no podía ser atacada, directa o colateralmente, en ningún procedimiento.
Consideramos, al igual que opina el profesor González Tejera, que el lenguaje de ese estatuto, aunque no es claro, fija un término igual para atacar la adopción por vicios del consentimiento. Como expresáramos, el derogado Art. 135 del Código Civil de Puerto Rico exigía, antes de la reforma en materia de adopción de 1995, que los padres de un me-nor de edad prestasen su consentimiento a la adopción de su hijo o hija biológica. Si el hijo era de filiación extrama- *258 trimonial, sólo el padre que lo había reconocido era aquel llamado a proveer su consentimiento.
Por consiguiente, cuando el consentimiento del padre o la madre biológica fue prestado, pero estuvo viciado por el error, el dolo, la violencia, o la intimidación, la acción de impugnación deberá ser instada en el término de caduci-dad de dos años desde que se decretó la adopción.
En este caso, la madre del menor sí prestó su consenti-miento, aunque treinta años después alegue que estuvo viciado. Cónsono con lo anterior, la madre gozaba de un término de dos años de caducidad, desde que se decretó la adopción el 21 de febrero de 1973, para impugnar la adopción. Para los hechos de este caso, no nos corresponde analizar si la norma que resolvimos en Almodóvar v. Méndez Román,(177) aplica también a los casos de impugnación de las adopciones. Al examinar el expediente encontramos que el señor Beníquez Mendez tenía seis años de edad cuando su madre y él se mudaron de la casa de sus tíos. Al tomar esa acción, la madre de Beníquez Méndez se alejó del ambiente familiar y comunitario que viciaba su consentimiento. Aún si aplicáramos la norma de ese caso, ya han pasado más de treinta años desde el cese de esa supuesta intimidación o violencia, por lo que a todas luces, la acción para invalidar la adopción ha caducado. Por ese motivo procede su desestimación.
C. El señor Beníquez Méndez y su derecho a conocer su filiación biológica paternal
Finalmente, resta disponer si, a pesar de haberse re-suelto que la acción de impugnación de la adopción del se-ñor Beníquez Méndez había caducado, procede que el Tribunal de Primera Instancia continúe con la acción de *259 reconocimiento forzoso de filiación presentada contra el se-ñor Vargas Seín. Veamos.
Según expusimos en nuestro marco legal, la institución de la filiación se desdobla en dos vertientes fundamentales: la natural y la jurídica. En el caso de autos, el recurrido conocía su filiación natural maternal —la señora Beníquez Seguí— pero desconocía su filiación natural paternal. Al-gunos años después de su nacimiento, el señor Beníquez Méndez fue adoptado por sus tíos segundos maternos. Me-diante la referida adopción, todos los vínculos jurídicos existentes entre el recurrido y su madre o padr.e biológico cesaron de existir, y para todos los efectos legales, el señor Beníquez Méndez vino a ser hijo de sus tíos maternos por virtud de la filiación jurídica de la adopción.
Tres décadas después, el recurrido procura conocer a su padre biológico mediante la presentación de una acción de reconocimiento forzoso de filiación paterna extra-matrimonial. Debido a que el Art. 137 de nuestro Código Civil, supra, dispone que la filiación natural subsiguiente no es contradictoria a una filiación adoptiva preexistente, no encontramos impedimento doctrinal alguno que sirva de tropiezo para que el foro primario considere adecuada-mente la acción de determinación de filiación extramatri-monial instada por el recurrido. Esa solicitud fue instada oportunamente.
Siempre y cuando la acción haya sido presentada du-rante la vida del presunto padre, o un año después de su muerte —salvo ciertas excepciones discutidas— el peticio-nario podrá presentar toda aquella prueba pertinente que constate el hecho filiatorio alegado. Claro está, de prospe-rar en su acción de reconocimiento forzoso, la resolución emitida por el tribunal no eliminará los vínculos jurídicos existentes entre sí y su familia adoptiva y tampoco revivirá su relación jurídica con su familia de sangre. Esta última relación sólo subsistirá a los únicos fines de impedir que el recurrido se case con algún pariente de su familia natural, *260 según prohibido por nuestro ordenamiento legal, o que in-curra en ciertos delitos que tipifican las relaciones consen-súales entre parientes de determinados grados de consan-guinidad o afinidad.
Atendido lo anterior, encontramos innecesario expresar-nos sobre el último error planteado por los peticionarios, especialmente cuando concebimos que los hechos alegados en la demanda de los recurridos no configuran fraude al tribunal, el cual justifique un término mayor al de seis meses, provisto para la presentación de una moción de re-levo de sentencia.
IV
Por los fundamentos expuestos, confirmamos en parte el dictamen del Tribunal de Apelaciones y devolvemos el caso al Tribunal de Primera Instancia para que éste continúe con los procedimientos relacionados a la acción de recono-cimiento forzoso instada por el señor Beníquez Méndez contra el señor Vargas Seín. No obstante, desestimamos la ac-ción de impugnación de adopción de los recurridos por entender que ésta ha caducado.

Se dictará sentencia de conformidad.

El Juez Presidente Señor Hernández Denton disintió con una opinión escrita. La Jueza Asociada Señora Fiol Matta está conforme con la determinación de que en el presente caso no debe aplicarse la doctrina de cosa juzgada ni su modalidad de impedimento colateral por sentencia y concurre con la decisión de devolver el caso al Tribunal de Primera Instancia para que continúe el trámite de la ac-ción de reconocimiento forzoso presentada contra el señor Vargas Seín. No obstante, disintió de la conclusión de que la acción de impugnación de la adopción caducó, puesto que es palpable la posibilidad de que el proceso de adopción hubiera sido simulado desde su inicio, por lo cual procede que el Tribunal de Primera Instancia reciba y aquilate *261 prueba sobre la validez de ese proceso. La Juez Asociada Señora Rodríguez Rodríguez concurrió y disintió con una opinión escrita.

 Petición de certiorari, Apéndice, pág. 108.

 íd.

 íd.

 Íd., págs. 113-114.

 Íd., pág. 113.

 Íd.

 Íd., pág. 115.

 Íd., págs. 109-112.

 Petición de certiorari, Apéndice, págs. 199-200. Esta adopción se configuró al amparo de la derogada Ley Núm. 86 de 15 de junio de 1953 (31 L.P.R.A. ant. see. 531).

 Íd., págs. 201-203.

 Íd., págs. 201-202. No obstante, los recurridos no proveyeron fundamento alguno para sustentar sus alegaciones de coacción, intimidación y vicios en el con-sentimiento de la señora Beníquez Seguí.

 Íd.

 Petición de certiorari, Apéndice, pág. 202.

 Íd., págs. 202-203.

 Íd., pág. 218. Esta decisión fue notificada a las partes el 18 de septiembre de 2003.

 Véase, Petición de certiorari, Apéndice, págs. 63-66.

 Íd., págs. 64 y 65.

 Íd., pág. 63.

 Íd., pág. 64.

 Íd., pág. 66.

 Véase la Petición de certiorari, Apéndice, págs. 45-61. Esta sentencia fue notificada a las partes el 3 de enero de 2006.

 Íd., pág. 49.

 Íd., págs. 52-53, 54 y 55.

 Íd., págs. 54-55.

 Íd., págs. 55-56.

 Íd., págs. 60-61.

 Petición de certiorari, Apéndice, págs. 1-25.

 Petición de certiorari, pág. 8.

 31 L.P.R.A. sec. 3343.

 Véase, también, Parrilla v. Rodríguez, 163 D.P.R. 263, 267 (2004).

 Según expusimos en Bolker v. Tribunal Superior, 82 D.P.R. 816, 824 (1961), “la sentencia que se invoque debe tener el carácter de firme, pues contra la presun-ción de cosa juzgada ‘sólo será eficaz la sentencia ganada en juicio de revisión’, y el tribunal que la dictó debe haber actuado con jurisdicción”.

 P.R. Wire Prod. v. C. Crespo & Assoc., 175 D.P.R. 139, 151 (2008), citando a, Méndez v. Fundación, 165 D.P.R. 253 (2005); Pagán Hernández v. U.P.R., 107 D.P.R. 720, 732-733; Mercado Riera v. Mercado Riera, 100 D.P.R. 940, 950 (1972).

 Worldwide Food Dis., Inc. v. Colón et al., 133 D.P.R. 827, 833-834 (1993).

 Méndez v. Fundación, supra, pág. 267.

 Art. 1204 del Código Civil de Puerto Rico, supra.

 Hernández Pérez v. Halvorsen, 176 D.P.R. 344, 354 (2009), opinión concu-rrente de la Juez Asociada Señora Rodríguez Rodríguez. Véase, también, Lausell Marxuach v. Díaz de Yáñez, 103 D.P.R. 533 (1975). “Sobre la identidad de cosas nos dice Scaevola que: ‘Puede tratarse de la absoluta identidad, en el sentido de que el segundo pleito se refiera a la finca u objeto mismo sobre que versó el primero, pero en general basta que se refiera al mismo asunto, aunque en el uno se abordase total-mente y sólo parcialmente en el otro, y aunque las cosas hayan sufrido disminución o alteración, desde el primero al segundo, que afecte su valor o alguna otra de sus condiciones’ ... Manresa, por otro lado, señala que: ‘Cuando se reclaman derechos (verbigracia, usufructo, posesión, uso, etc.) puede una misma cosa ser objeto de dife-rentes litigios, salvo el caso de fundarse todos esos derechos en una misma causa ya resuelta, verbigracia, un mismo contrato declarado nulo.’ ” (Énfasis y citas omitidas.) Mercado Riera v. Mercado Riera, supra, pág. 950.

 Worldwide Food Dis., Inc. v. Colón et al., supra, pág. 835, citando a A & P Gen. Contractors v. Asoc. Caná, 110 D.P.R. 753, 765 (1981).

 Hernández Pérez v. Halvorsen, supra, pág. 356.

 Íd., pág. 354.

 Méndez v. Fundación, supra, pág. 268, citando a Mun. de San Juan v. Bosque Real, S.E., 158 D.P.R. 743, 770 (2003); Pagán Hernández v. U.P.R., supra, pág. 737; Pérez v. Bauzá, 83 D.P.R. 220, 226 (1961).

 Méndez v. Fundación, supra, pág. 268, citando a, Meléndez v. García, 158 D.P.R. 77, 92 (2002); Pagán Hernández v. U.P.R., supra, pág. 736; P.R.T.C. v. Unión Indep. Emp. Telefónicos, 131 D.P.R. 171, 194 (1992); Feliciano Ruiz v. Alfonso Develop. Corp., 96 D.P.R. 108, 114 (1968); Millán v. Caribe Motors Corp., 83 D.P.R. 494, 509 (1961).

 Méndez v. Fundación, supra, pág. 268.

 Fatach v. Triple S, Inc., 147 D.P.R. 882, 889 (1999); Parrilla v. Rodríguez, supra, pág. 268.

 Méndez v. Fundación, supra, pág. 269.

 J.A. Echevarría Vargas, Procedimiento Civil Puertorriqueño, Colombia, Ed. Nomos, 2010, pág. 343. Véase, también, Rodríguez Rodríguez v. Colberg Comas, supra, pág. 221.

 P.R. Wire Prod. v. C. Crespo & Assoc., supra, pág. 152. En Fatach v. Triple S, Inc., supra, págs. 889-890, reiteramos que la doctrina de impedimento colateral se manifiesta en dos modalidades, a saber: la ofensiva y la defensiva.
“En su modalidad ofensiva, un demandante le impide al demandado litigar otra vez los asuntos que previamente litigó y perdió frente a otra parte. La modalidad defensiva surge cuando un demandado impide a un demandante que litigue otra vez asuntos que previamente litigó y perdió frente a otra parte. A & P Gen. Contractors v. Asoc. Caná, supra, pág. 758. Ambas modalidades comparten el denominador co-mún de que la parte afectada por la doctrina litigó y perdió el asunto en el pleito anterior”.

 Millán v. Caribe Motors Corp., 83 D.P.R. 494, 506-507 (1961); Aponte v. Roman, 145 D.P.R. 477, 488-489 (1998).

 P.R. Wire Prod. v. C. Crespo & Assoc., supra, pág. 153.

 Castro v. Negrón, 159 D.P.R. 568, 579-580 (2003).

 J. Castán Tobeñas, Derecho Civil español, común y foral, 10ma ed., Madrid, Ed. Reus, 1995, T. 5, Vol. II, págs. 15-17. Véase, también, Mayol v. Torres, 164 D.P.R. 517, 529 (2005).

 L. Diez-Picazo y A. Gullón, Sistema de Derecho Civil, 5ta ed., Madrid, Ed. Tecnos, 1989, Vol. IV, pág. 249.

 Íd. Véase, también, Sánchez v. Sánchez, 154 D.P.R. 645, 660 (2001).
*227 En Mayol v. Torres, supra, págs. 529-530, abundamos sobre la distinción entre la filiación biológica y la jurídica de la manera siguiente:
“Del hecho de que toda persona deba la existencia a su procreación o generación por un hombre y una mujer deriva su filiación (biológica) respecto de sus progenito-res, y también su filiación jurídica, expresión para el Derecho, en línea de principio, de aquella relación biológica. De ese hecho jurídico de la filiación deriva luego la relación jurídica de filiación (de paternidad/maternidad, vista desde el lado de los progenitores), entendida como la existente entre generantes y generados, padres e hijos con el conjunto de derechos, deberes, funciones y, en general, relaciones, que los vincula en una de las más ricas y complejas instituciones jurídicas y humanas que el Derecho contempla.”

 J.L. Lacruz Berdejo y otros, Elementos de Derecho Civil: Familia, 2da ed., Madrid, Ed. Dykinson, 2005, Vol. IV, pág. 307. Véase, también, Sánchez v. Sánchez, supra, pág. 661.

 Calo Morales v. Cartagena Calo, 129 D.P.R. 102, 112 (1991), citando a, L. Diez-Picazo y A. Gullón Ponce de León, Sistema de Derecho Civil, 3ra ed. rev., Madrid, Ed. Tecnos, 1983, T. IV, pág. 314. Véase, también, Sánchez v. Sánchez, supra, pág. 661.

 Castro v. Negrón, supra, pág. 580.

 R. Serrano Geyls, Derecho de familia de Puerto Rico y legislación compa-rada, San Juan, Ed. Programa de Educación Jurídica Continua de la U.I.P.R., 2002, Vol. II, pág. 886.
Claro está, a pesar de existir la posibilidad de que la filiación jurídica no sea un reflejo de la filiación biológica, es importante señalar que el derecho puertorriqueño “se empeña en apoyar la paternidad jurídica en la biológica y hace los máximos esfuerzos porque ambos conceptos concuerden”. (Citas omitidas.) Calo Morales v. Cartagena Calo, supra, pág. 111.

 Lacruz Berdejo y otros, op. cit., pág. 307.

 R.E. Ortega-Vélez, La filiación: apuntes y jurisprudencia, San Juan, Ed. Scisco, 1997, pág. 1. Véanse, también: J. Puig Brutau, Fundamentos de Derecho Civil, 2da ed., Barcelona, Ed. Bosch, 1985, T. IV, págs. 188-189 (interpretando el Art. 108 del Código Civil español, según fue reformulado en 1981); Castán Tobeñas, op. cit., pág. 20.

 Lacruz Berdejo y otros, op. cit, pág. 312. Véanse, también: Sánchez v. Sánchez, supra, pág. 662; Almodóvar v. Méndez Román, 125 D.P.R. 218, 235 (1990).

 Ortega-Vélez, op. cit, pág. 1. Véanse, también: Castro v. Negrón, supra, pág. 583; Almodóvar v. Méndez Román, supra, pág. 235.

 Ortega-Vélez, op. cit, pág. 17. Véase, también, Almodóvar v. Méndez Román, supra, pág. 235.

 31 L.P.R.A. secs. 461. Véase, también, Almodóvar v. Méndez Román, supra, pág. 235.

 “Igualmente es legítimo el hijo nacido dentro de los ciento ochenta (180) días siguientes a la celebración del matrimonio, si el marido no impugnare su legitimidad.” Art. 114 del Código Civil, 31 L.P.R.A. ant. sec. 462.
Por otro lado, para que opere la presunción establecida por el Art. 113 del Có-digo Civil, supra, será necesaria la concurrencia de los elementos siguientes: que se acredite la maternidad; que exista un vínculo matrimonial entre la madre y el hombre a quien se le atribuye la paternidad, y que el nacimiento ocurra luego de cele-brarse el matrimonio, pero antes de los trescientos días de haber sido disuelto. Véase Castro v. Negrón, supra, pág. 610, opinión disidente de la Juez Asociada Señora Naveira de Rodón.

 Diez-Picazo y Gullón, op. cit., pág. 254. Véanse, también: Calo Morales v. Cartagena Calo, supra, págs. 115-116; Almodóvar v. Mendez Román, supra, págs. 235-236.

 íd. Véanse, también: Calo Morales v. Cartagena Calo, supra, págs. 112-113; Ramos v. Marrero, 116 D.P.R. 357, 360 (1985).

 íd.

 íd.

 Serrano Geyls, op. cit., págs. 910-911.

 íd., pág. 963 (“el hijo de matrimonio nace con una presunción de filiación que le otorga la ley, que sólo pierde por las causas y mediante los procedimientos pertinentes, pero el hijo extramatrimonial nace sin esa presunción y tiene que buscar su filiación, si ese fuera su deseo, conforme a las pruebas y procedimientos estable-cidos por ley”). Véase, también, Sánchez v. Sánchez, supra, pág. 664.

 Almodóvar v. Méndez Román, supra, págs. 236-237 y 248-249.

 Ortega-Vélez, op. cit., pág. 37. Véase, también, Serrano Geyls, op. cit., pág. 963 (“[L]a filiación extramatrimonial se establece por dos medios: el reconocimiento voluntario hecho por los padres o el reconocimiento forzoso o acción de filiación que, como su nombre indica, nace de una sentencia judicial que establece la filiación solicitada”). Véanse, también: Castro v. Negrón, supra, pág. 584; Rivera v. Jaume, 157 D.P.R. 562, 572 (2002).

 Íd., pág. 42. Según el Art. 113 del Código Civil, “[e]l reconocimiento volun-tario crea una presunción de paternidad a favor del reconocedor”. 31 L.P.R.A. sec. 461. Para una discusión exhaustiva sobre el contenido y la naturaleza del reconoci-miento voluntario, refiérase a Almodóvar v. Méndez Román, supra, págs. 238-240.

 Sánchez v. Sánchez, supra, pág. 664.

 Almodóvar v. Méndez Román, supra, págs. 237-238.

 Sánchez v. Sánchez, supra, pág. 664.

 Ortega-Vélez, op. cit., pág. 44. Claro está, aunque hemos establecido que existen dos presunciones de paternidad —la que establece el Art. 113 del Código Civil, 31 L.P.R.A. sec. 461, que consiste en suponerlos hijos del marido, y la presun-ción derivada del reconocimiento que los supone hijos del reconocedor — ■, es impres-cindible tener presente que ambas surten iguales efectos. Castro v. Negrón, supra, pág. 585.

 Art. 125 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 504. En lo perti-nente, dispone que “[e]l padre está obligado a reconocer al hijo natural: ... (4) [c]uando el hijo pueda presentar cualquier prueba auténtica de su paternidad”.
Además, cuando la parte afectada resulta ser un menor de edad, el Art. 131 del Código Penal de Puerto Rico tipifica el delito del incumplimiento dé la obligación alimenticia, el cual permite la resolución colateral de todo reclamo de paternidad. 33 L.P.R.A. sec. 4759. Según dispusimos en Poll Sella v. Lugo Christian, 107 D.P.R. 540, 546-547 (1978), interpretando el derogado Art. 158 del Código Penal de 1974, la *232 disposición legal indicada goza de una naturaleza mixta —penal y civil— la cual requiere probar la paternidad del sujeto activo para fines de establecer uno de los elementos del delito. D. Nevares-Muñiz, Nuevo Código Penal de Puerto Rico, San Juan, Ed. Ins. Desarrollo del Derecho, 2008, págs. 173-177. Coetáneamente, esa prueba sirve como una determinación de paternidad, equiparable con el resultado de una acción civil filiatoria, que permite la inscripción en el registro demográfico de que el menor es hijo del acusado.
Por otro lado, la Ley Orgánica de la Administración para el Sustento de Meno-res, Ley Núm. 5 de 30 de diciembre de 1986, según enmendada, provee en su Sec. V, Art. 11, un procedimiento administrativo expedito para la determinación de filiación con el propósito de establecer una pensión alimenticia, al igual que la posibilidad de un reconocimiento voluntario de filiación vía un certificado de paternidad. 8 L.P.R.A. sec. 510. Véase, también, Vincenti v. Saldaña, 157 D.P.R. 37 (2002).

 Art. 126 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 505. Véase, también, Calo Morales v. Cartagena Calo, supra, pág. 120.

 R. Serrano Geyls, op. cit., pág. 1047. Véase, también, Calo Morales v. Cartagena Calo, supra, pág. 121. La caducidad es la decadencia de un derecho, o su pérdida, por no haber cumplido la formalidad o condición exigida por ley en un plazo determinado. Esta pérdida del Derecho se produce automáticamente por no ejerci-tarse en el transcurso de dicho plazo. Castra v. Negrón, supra, pág. 596 esc. 25.

 Sánchez v. Sánchez, supra, pág. 667 (“Ahora bien, aun cuando ante la ley los hijos tienen los mismos derechos, sin importar las circunstancias en las que se haya dado su nacimiento, es menester ‘distinguir’ entre éstos, ello únicamente con el fin de precisar que la acción de impugnación de paternidad o filiación legítima es aquella mediante la cual se cuestiona la paternidad de los hijos matrimoniales. Por otra parte, no hay tal acción de impugnación de paternidad extramatrimonial, sino la *233 acción, ya reiterada por este Foro, catalogada por nuestro ordenamiento como la de impugnación de reconocimiento”). (Énfasis suprimido.)

 Almodóvar v. Méndez Román, supra, págs. 234-235.

 Íd., pág. 234. Véase, también, Castro v. Negrón, supra, pág. 582.

 Castro v. Negrón, supra, pág. 585.

 López v. E.L.A., 165 D.P.R. 280, 299 (2005); Zapata et al. v. Zapata et al., 156 D.P.R. 278, 286 (2002).

 Lacruz Berdejo y otros, op. cit., pág. 312.

 López Rivera v. E.L.A., supra, pág. 299; Zapata et al. v. Zapata et al., supra, pág. 286.

 Lacruz Berdejo y otros, op. cit., pág. 307.

 31 L.P.R.A. secs. 531-536. Véanse, además: Martínez Soria v. Proc. Esp. Rel. Fam., 151 D.P.R. 41 (2000); Ex parte Warren, 92 D.P.R. 299 (1965).

 Amerita señalar que al momento de los hechos bajo examen, el Código Civil de Puerto Rico, en su Art. 135, proveía que toda adopción requería el consentimiento: del adoptado, si era mayor de edad; de los padres o tutores de un menor de edad o *235 incapacitado, y del adoptado, si era mayor de diez años de edad. 32 L.P.R.A. sec. 536 (ed. 1967). Siendo éstas las personas afectadas por un decreto de adopción que no cuente con su consentimiento, o que esté viciado, resulta lógico concluir que éstos constituyen las personas legitimadas a instar la acción de impugnación de adopción discutida.

 M.J.C.A., menor v. J.L.E.M., menor, 124 D.P.R. 910, 921 (1989).

 íd.

 Art. 612 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2691 (ed. 1968). En la actualidad, las partes interesadas en adoptar deberán presentar una petición de adopción la cual cumpla con los requisitos sustantivos esbozados en los Arts. 130 al 138 de nuestro Código Civil. 31 L.P.R.A. secs. 531-539. A su vez, será imprescin-dible que se cumpla con los elementos procesales esbozados en el Art. 143 del Código Civil, 31 L.P.R.A. sec. 535, y en las Secs. 33-39 (32 L.P.R.A. secs. 2699-2699t), según fueron enmendadas por la Ley Núm. 186-2009.

 Art. 612 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2691 (ed. 1968).

 Art. 613 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2692 (ed. 1968), según fue enmendado por la Ley Núm. 53 de 22 de mayo de 1968 (32 L.P.R.A. sec. 2692 (ed. 1990). El articulado exigía que el estudio social incluyera, además de las circunstancias de la petición, el historial social de los solicitantes, del menor o inca-pacitado y de sus padres biológicos; los planes de los solicitantes para con el menor o incapacitado y cualesquiera otros hechos pertinentes a las relaciones entre el menor o incapacitado y los solicitantes y entre el menor o incapacitado y sus padres biológicos. íd.

 íd.

 Art. 613D del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2696 (ed. 1990).

 Art. 613C del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2695 (ed. 1990).

 Art. 133 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 534 (ed. 1967).

 Ex parte J.A.A., 104 D.P.R. 551, 554 y 556 (1976); Art. 132 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 533 (ed. 1967).

 R. Serrano Geyls, op. cit., pág. 1187.

 Art. 613E del Código de Enjuiciamiento Civil, 32 L.RR.A. sec. 2697 (ed. 1990).

 Serrano Geyls, op. cit., pág. 1187.

 íd.

 íd.

 En el referido caso, los Jueces Asociados Señores Negrón García, Fuster Berlingeri y la Jueza Asociada Señora Naveira de Rodón, suscribieron opiniones concurrentes separadas. Los Jueces Asociados Señores Rebollo López y Hernández Denton concurrieron con el resultado y el Juez Asociado Señor Corrada del Río disintió con una opinión escrita.

 Martínez Soria v. Proc. Esp. Rel. Fam., supra, págs. 41-42.

 íd., pág. 42.

 íd.

 pág. 43

 íd.

 Martínez Soria v. Proc. Esp. Rel. Fam., supra, pág. 44.

 íd.

 íd., págs. 44-45.

 íd., págs. 46-47.

 Martínez Soria v. Proc. Esp. Rel. Fam., supra, págs. 62 y 63, opinión con-currente de la Juez Asociada Señora Naveira de Rodón.

 íd., pág. 63.

 íd., págs. 60-61.

 íd., págs. 60-61.

 íd., pág. 61.

 íd., pág. 47, opinión concurrente del Juez Asociado Señor Negrón García.

 íd.

 íd.

 31 L.P.R.A. sec. 505.

 Martínez Soria v. Proc. Esp. Rel. Fam., supra, pág. 48, opinión concurrente del Juez Asociado Señor Negrón García.

 íd., pág. 49.

 íd.

 íd.

 íd., pág. 51.

 íd., pág. 52.

 32 L.P.R.A. Ap. III. Se refería a las Reglas de Procedimiento Civil de 1979 que eran las vigentes en aquel entonces.

 Martínez Soria v. Proc. Esp. Rel. Fam., supra, pág. 52.

 íd., pág. 68, opinón concurrente del Juez Asociado Señor Fuster Berlingeri.

 íd., págs. 68-69.

 íd., pág. 69.

 íd.

 íd.

 íd., pág. 70.

 Íd., pág. 71. Véase, además Valladares de Sabater v. Rivera Lazú, 89 D.P.R. 254, 261-262 (1963).

 Íd., pág. 72.

 Íd., pág. 76; Serrano Geyls, op. cit., pág. 1192.

 Íd., págs. 76-77.

 Íd., pág. 77.

 Íd., pág. 86, opinión disidente del Juez Señor Corrada del Río.

 Íd., págs. 86-87.

 Íd., pág. 87.

 Íd., págs. 92-93.

 1953 Leyes de Puerto Rico 299. Ex parte Warren, supra, pág. 305 esc. 7. Esa ley uniforme regulaba en su Sec. 17 las causas de anulación de la adopción. Especí-ficamente, limitaba la anulación a los casos en los que el menor adoptado desarro-llara, en los dos años luego de la adopción, cualquier incapacidad o malignidad mental o física seria o permanente que fuera producto de una condición existente antes de la adopción y de la cual los padres adoptantes no tenían ningún conocimiento o notificación. Como vemos, la anulación de una adopción podía darse únicamente por razón de condiciones graves de salud del menor adoptado. Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Annual Conference Meeting in its Sixty-Second Year, Boston, Massachusetts (Agosto 17-2,2 1953), págs. 221-222.

 R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed., San Juan, Pubs. J.T.S., 1987, pág. 451.

 A.H. Howard, Annulment of Adoption Decrees on Petition of Adoptive Parents, 22 J. Fam. L. 549 (1983-1984).

 Rivera Coll v. Tribunal Superior, supra, pág. 327.

 613E, supra.

 E. González Tejera, Bienestar del menor: señalamientos en torno a la patria potestad, custodia y adopción, 54 Rev. Jur. U.RR. 409, 490 (1985).

 íd.

 íd.

 íd., pág. 491.

 íd. Hace referencia específicamente al Art. 1217 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 3404, que dispone que será anulable el consentimiento pres-tado por error, violencia intimidación o dolo y a la interpretación que se le ha dado a esta figura.

 íd.

 íd. En cuanto a quiénes tendrían capacidad para iniciar un procedimiento de nulidad de la adopción, el autor opina que “[t]al como está redactado el Artículo 613E, parece que corre contra todos cuantos puedan ejercer la acción, sean mayores o menores de edad, por tratarse de un plazo de caducidad”. íd., págs. 492-493.

 gj derecho de adopción sufrió varias reformas posteriores a la derogación de la referida disposición legal. Así, mediante la reforma ejercida a nuestro derecho de adopción por conducto de las Leyes Núms. 8 y 9 de 1995, supra, la Asamblea Legislativa clarificó en parte algunas de las interrogantes dejadas sin contestar por la Ley de 1953.
Particularmente, la Ley Núm. 9, supra, precisó la naturaleza irrevocable de un decreto de adopción (32 L.P.R.A. sec. 2699p) y concretizó las circunstancias ante las cuales procedía una acción de anulabilidad, estableciendo, a su vez, un término de caducidad de un año para la acción (32 L.P.R.A. ant. sec. 2699r). Concretamente, el legislador dispuso en el Art. 18 de la Ley Núm. 9, que “[sería] anulable el decreto de adopción cuando no se [hubiese] notificado a las partes que tenfían] derecho a noti-ficación a tenor con lo [que disponía el Código de Enjuiciamiento Civil], o cuando [hubiesen] mediado vicios del consentimiento del padr-e o madre biológicos, o fraude al tribunal”. 32 L.P.R.A. sec. 2699q.
Finalmente, en el 2009, la Asamblea Legislativa incursionó en una nueva refor-mulación de nuestras normas de adopción. Así, mediante la See. 38 de la Ley Núm. 186 de 18 de diciembre de 2009, se enmendó el Art. 6130 de la Ley Núm. 9, supra, reduciéndose el término de caducidad disponible para que una parte con legitimidad para ello inste una acción de anulabilidad de adopción. Específicamente, ahora “[l]a acción judicial sobre anulabilidad de la adopción decretada tiene que ser instada dentro del término de caducidad de seis (6) meses a partir de la fecha en que el decreto de adopción advenga final y firme”, en lugar del año que antes proveía la Ley Núm. 9, supra.

 Castro v. Negrón, supra, págs. 591-592.

 E. Toral Lara, Novedades en materia de determinación y prueba de filia-ción, en E. Llamas Pombo, Nuevos conflictos del derecho de familia, Madrid, Ed. La Ley, 2009, pág. 323.

 Sánchez v. Sánchez, supra, pág. 672.

 Toral Lara, op. cit., pág. 323.

 íd.

 31 L.P.R.A. sec. 538 (2010).

 Lacruz Berdejo, op. cit., pág. 393. Véanse, también, Castán Tobeñás, op. cit., pág. 440; Diez-Picazo y Gullón, op. cit., pág. 312.

 Lacruz Berdejo y otros, op. cit, pág. 394.

 íd., pág. 393.

 El Art. 138 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 539, provee lo siguiente:
“No obstante lo dispuesto en la sec. 538 de este título, los vínculos jurídicos del adoptado con su familia paterna o materna anterior subsistirán cuando el adoptado sea hijo del cónyuge del adoptante, aunque el padre o madre hubiere fallecido a la fecha de presentación de la petición de adopción, o cuando el adoptado proviene de una única filiación y es adoptado por persona de distinto sexo al del padre o madre que lo ha reconocido como su hijo.
“La ruptura y extinción de los vínculos jurídicos con la familia anterior del adoptado, y el nacimiento de tales vínculos con la familia del adoptante, se entende-rán sin perjuicio de la reglamentación sobre impedimentos y prohibiciones de ley para contraer matrimonio en Puerto Rico. Un adoptado no podrá contraer matrimo-nio con un pariente de su anterior familia, en los mismos casos en que no hubiere podido contraerlo de no haber ocurrido la adopción.
“La responsabilidad penal del adoptado en los delitos contra la familia y el estado civil seguirá siendo la misma que dispone el ordenamiento jurídico vigente, en relación a su familia biológica anterior, tal y como si no se hubiere decretado la adopción, si se probare que el adoptado conocía de su vínculo familiar con la víctima del incesto.
“El adoptado adquirirá los apellidos del adoptante o los cónyuges adoptantes, salvo que el tribunal, por causa justificada, determine otra cosa.”

 Rivera Pérez v. León, 138 D.P.R. 839, 849 (1995), citando a Ramos v. Marrero, supra, pág. 358; Calo Morales v. Cartagena Calo, supra, pág. 119.

 Rivera Pérez v. León, supra, pág. 849. En esa encomienda, hemos sido prontos en reconocer las alteraciones profundas que ha sufrido el derecho de filiación a nivel mundial, incluyendo “la gran apertura en orden al establecimiento de la filiación, sobre todo en vía judicial, y en cuanto a su impugnación, con su amplia admisibilidad y uso práctico de las pruebas biológicas”. (Enfasis suprimido.) Mayol v. Torres, supra, pág. 534. Así, nuestro “pensamiento jurídico es cónsono con ‘el énfasis moderno en el descubrimiento de la verdad biológica’ ”. (Citas omitidas.) Id., pág. 535.

 Castro v. Negrón, supra, págs. 581-582. En Mayol v. Torres, supra, págs. 530-531, fuimos extensos en identificar los efectos y las consecuencias jurídicas im-plicadas por una determinación de filiación. Allí expusimos lo siguiente:
“En cuanto a los efectos de la determinación de filiación, siempre hemos desta-cado lo amplio y complejos que son los derechos y las obligaciones que ésta conlleva. Así, hemos expresado que ‘de la filiación dependen varios estados civiles, que como tales, concretan la capacidad e independencia de la persona’. Almodóvar v. Méndez Román, 125 D.P.R. 218, 232 (1990). En ese caso explicamos que
“ ‘... de ser hijo de tal o cual persona deriva que se tenga una u otra nacionali-dad, o una u otra vecindad ... cualidades éstas que deciden el régimen de los demás estados de la persona, ya que la capacidad y las relaciones familiares se rige[n] por la ley personal ... aparte de la trascendencia que la determinación de la ley personal tiene en el régimen de otras materias (sucesiones, donaciones, obligaciones ...). De la filiación depende directamente además la determinación de las personas que están legitimadas para provocar un cambio de estado civil (emancipación, adopción), o para promover judicialmente el cambio (por incapacitación). La filiación determina, tam-bién, las personas a quienes se está sujeto durante la minoría de edad (o en situación de patria potestad prorrogada). Influye la filiación en el poder de la persona: por la filiación se conoce si una persona tiene herederos forzosos, con la consiguiente tras-cendencia en relación con la potestad de donar ... o de disponer ‘mortis causa’... o, en general, con la potestad de gestión del propio patrimonio (por la posible declaración *253 de prodigalidad (Énfasis en el original.) Almodóvar v. Méndez Román, supra, pág. 233, citando a M. Peña Bernaldo De Quirós, De la Paternidad y Filiación, en M. Amorós Guardiola, Comentarios a las reformas del derecho de familia, Madrid, Ed. Tecnos, 1984, Vol. I, pág. 795.’
“Queda claro que la filiación incide con mayor intensidad en el derecho de fa-milia (en aquello relacionado con el estado civil, la persona, el derecho de alimentos, patria potestad, entre otros aspectos) y el derecho sucesorio. Sin embargo, no debe-mos soslayar las notables consecuencias vinculadas al derecho penal derivadas de la determinación de filiación. Entre otras, nuestro Código Penal dispone en su Art .... [142(h) (33 L.P.R.A sec. 4770) ], que ... [incurrirá en delito grave de segundo grado severo toda persona que lleve a cabo una penetración sexual, sea vaginal, anal, orogenital, digital o instrumental ... con sus] ascendientes y descendientes, y colate-rales por consanguinidad, [o con una víctima con quién tenga una relación de paren-tesco por motivo de una adopción] .... La filiación no se limita, pues, a establecer vínculos tendentes a identificar relaciones entre componentes de la sociedad, sino que va dirigida a imponer derechos y obligaciones concretas de consecuencias permanentes.”

 íd.

 Banco de la Vivienda v. Carlo Ortiz, 130 D.P.R. 730, 739 (1992); Pérez v. Bauzá, supra, pág. 226.

 íd., págs. 226-227.

 íd. Véase, además, Mercado Riera v. Mercado Riera, supra, pág. 953.

 Almodóvar v. Méndez Román, supra, pág. 261. En ese caso resolvimos que en casos de haber mediado intimidación o violencia, el plazo para iniciar una acción de impugnación de reconocimiento al amparo del Art. 117 del Código Civil, 31 L.P.R.A. sec. 465, comenzaría a transcurrir una vez cesaran esas circunstancias. Cabe señalar que el Art. 117 del Código Civil, supra, fue enmendado por la Ley Núm. 215-2009.